## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

S.P.[1]

     Plaintiff,

v.                                                        Civil Action No. <u>4:2021-CV-338</u>

UNITED STATES OF AMERICA;
OFFICER JIMMY HIGHSMITH,
and NAKAMOTO GROUP, INC.

     Defendants.

_____/

## **<u>COMPLAINT</u>**

Plaintiff, S.P., was sexually assaulted and battered while incarcerated at Federal Correctional Institution Tallahassee ("FCI Tallahassee"). By and through her attorneys, S.P. brings claims against Defendant Jimmy Highsmith based on the Eighth Amendment to the United States Constitution pursuant to the legal standards set forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), against Defendant United States of America based upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* , and against Defendant Nakamoto Group, Inc. based on applicable principles of both contractual and tort law.

---

[1] These initials, and all initialized references to inmate victims of sexual assault at FCI Tallahassee, are pseudonyms used to protect the subject's identities for personal safety reasons. These individuals have legitimate fears of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

As a result of the repeated assaults visited upon her while she was an inmate at FCI Tallahassee, S.P. suffered injuries, including: physical battery, sexual contact and abuse, and the dignitary injury of being forced to endure sexual touching, which was harmful and offensive in the extreme, and to which she did not consent, for which she had neither the legal nor volitional capacity to consent, and from which she had no lawful means of escape.

For her complaint against Defendants, S.P. states as follows:

## **PARTIES**

1.     Plaintiff, S.P., was at all times relevant to this complaint in the custody of the Federal Bureau of Prison ("BOP"), including at Federal Correctional Institution

Tallahassee ("FCI Tallahassee"), which is the prison facility located within the Northern District of Florida where the sexual illegalities described herein occurred.

2.     Defendant Jimmy Lee Highsmith ("Defendant Highsmith") is a serial sexual abuser of BOP inmates.  At times relevant to this complaint he was employed by the BOP as a Correctional Officer at FCI Tallahassee and was responsible for, but not limited to, maintaining security and providing for the safekeeping, care, and protection of inmates incarcerated there, including plaintiff, S.P.

2

3.     Defendant Officer Highsmith was, at all times relevant to this complaint, acting under color of law and within the scope of his employment with the United States BOP.

4.     Defendant, United States of America, is a sovereign entity named herein pursuant to the Federal Tort Claims Act and oversees the Federal Bureau of Prisons, which is responsible for the custody and care of federal inmates.

5.     Defendant United States of America has various agencies including but not limited to the Office of Internal Affairs ("OIA"), the Office of Inspector General ("OIG"), the U.S. Department of Justice ("DOJ") and many other special agents and supervisory attorneys who are responsible for the investigation and prosecution of correctional officers sexually abusing inmates at federal institutions including FCI Tallahassee. SIS, OIA, OIG and DOJ are collectively referred to herein as the "Prison Investigative Agencies".

6.     Defendant Nakamoto Group, Inc. ("Defendant Nakamoto") is a Delaware Corporation with its principal place of business in the state of Maryland.

7.     The BOP contracted with Defendant Nakamoto to carry out inspections of FCI Tallahassee in accordance with the standards mandated by PREA. Defendant Nakamoto was contractually obliged to carry out those inspections as part of the auditing process required by PREA for the benefit of all inmates in the custody of FCI Tallahassee.

3

8.      At all times relevant to this complaint, Defendant Nakamoto was the auditor for inspecting, monitoring and oversight of BOP compliance with PREA standards at FCI Tallahassee.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1346 (b)(1), for claims are presented under the Federal Tort Claims Act 28 U.S.C. 2671, et seq. and under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

10.      Plaintiff filed an Administrative Claim (Form 95) on July 16, 2020, with the Federal Bureau of Prison's South-East Regional Office, and the six-month time period for a response or denial has passed. Consequently, her claim is now deemed denied, she has exhausted all obligatory administrative remedies, and the FTCA claim is legally ripened for presentation in this civil action.

11.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all of the events upon which this action is based occurred in the Northern District of Florida.

## FACTS

12.      At FCI Tallahassee, the BOP employs correctional officers, facilities staff, and management to oversee and operate the prison facility. The correctional

officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice serving "investigative or law enforcement" functions.

13. As a federal inmate, S.P. was committed to the Government's care, custody and control, and while in such custody, federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide protection … of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

14. As a federal inmate, S.P.'s options for escaping sexual battery or for resisting the sexually abusive conduct of a guard were limited. S.P. – like all inmates at FCI Tallahassee – relied on BOP employees and representatives to protect her from sexual abuse by guards and staff.

15. As a condition of his employment, Defendant Highsmith was or should have been required to attend and complete the BOP's Correctional Training Program, Phases I (an introductory two-week course) and II (a three-week long course). He was or should also have been required to attend an additional week of training specific to the supervision of female offenders. Moreover, annually, or otherwise periodically, Officer Highsmith would have received refresher training and continuing education on the prohibition against sexual abuse of inmates.

16.    The BOP's policies are contained in documents called "program statements" which set forth rules and procedures that all BOP employees are required to follow.

### BOP Program Statement 3420.11 – Standards of Employee Conduct

17.    Program Statement 3420.11 sets out the duties and responsibilities of all BOP employees. It requires that employees, "[A]s soon as practicable (but no later than 24 hours) report to their CEO (or other appropriate authority such as the Office of Internal Affairs or the Office of the Inspector General) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation. Every employee is required to immediately report to management any act or omission by any person that could result in a breach of institution security. Failure by employees to follow these regulations and policy or any other Bureau policy or relevant regulation(s) could result in disciplinary action, up to and including removal."

18.    Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

19.    Program Statement 3420.11 states that BOP employees are subject to administrative action, up to an including removal, for any inappropriate contact,

sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

20.    Program Statement 3420.11 goes on to state that "Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened. Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person. All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution".

21.    Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

22.    As a condition of his employment, Defendant Highsmith did or should have signed an acknowledgement that he received the updated version of Program Statement 3420.11.

## BOP Program Statement 5324.12 - Sexually Abusive Behavior Prevention and Intervention

23.    BOP Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements zero tolerance toward all forms

of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address prohibited and/or illegal sexually abusive behavior.

24.    Program Statement 5324.12 is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior. It is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

25.    Program Statement 5324.12 lays out duties and responsibilities with respect to conduct for all BOP employees, and mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

26.    BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

27.    Inmates, employees, and members of the public may file a complaint at the BOP facility where an incident of sexual abuse occurred; through BOP's Office

of Internal Affairs; or with the Department of Justice Office of Inspector general (OIG).

28.     In accordance with the agency's own Standards of Employee Conduct, BOP employees must report any violation of those Standards, or any rule or law within one business day of the incident to their Chief Executive Officer (CEO), OIA, or the OIG. Decisions regarding disciplinary action in cases where the allegations are sustained are managed by BOP's Human Resources Management (HRM) and BOP's Office of General Counsel.

## Defendant Highsmith's Employment History and Sexual Assault of T.D. in 2014

29.     Defendant Highsmith was hired by the BOP in April 2007 at FCI-Coleman, and later transferred to FCI-Tallahassee in May 2010.

30.     Since as late as 2014, Defendant Highsmith was known to many of his fellow officers, and administrators at FCI Tallahassee, including the Management Team and Human Resources Management, as well as internal Prison Investigative Agencies to be a sexual predator. Nevertheless, Defendant Highsmith was allowed unrestricted and unsupervised access to female inmates, including Plaintiff S.P.

31.     In 2014, the Office of Inspector General (OIG) received information from BOP Special Investigative Agent (SIA) Dan Clark alleging that on April 30,

2014, Defendant Highsmith sexually assaulted inmate T.D. inside the Officer's Station in C-Unit North of FCI Tallahassee.

32. This report by SIA Dan Clark triggered a joint investigation between the OIG and the Federal Bureau of Investigation of the allegations involving Defendant Highsmith. OIG investigators interviewed six staff members, thirteen inmates (including the victim, T.D.), and Defendant Highsmith. OIG investigators reviewed surveillance video and medical records of the victim. Additionally, physical evidence, including articles of clothing belonging to the victim and a washcloth used by her, fabric from the desk chair in the officer's station used by Defendant Highsmith, swabs from the same desk chair, the telephone cord in the officer's station, as well as a tampon, and vaginal and cervical swabs were collected as part of the OIG investigation.

33. The OIG determined that a preponderance of the evidence demonstrated that Defendant Highsmith likely sexually abused inmate T.D. and another unnamed victim who had since been released from BOP custody and was deported from the United States.

34. BOP Program Statement 3420.11 (Official Investigation) requires that "…[d]uring the course of an official investigation, employees are to cooperate fully by providing all pertinent information they may have. Full cooperation requires truthfully responding to questions…"

35.    In its investigative report to Warden Jones, the OIG noted that Defendant Highsmith's denials of the incidents of sexual assault under investigation were not credible and constituted false statements to the OIG. The OIG found that Highsmith's denials of the allegations were not credible because, among other things, his denials were inconsistent with the testimony of eyewitnesses and with the OIG's review of video surveillance following the incident.

36.    The OIG concluded that by failing to provide truthful information during his interviews by OIG, Defendant Highsmith had further violated BOP Program Statement 3420.11 provisions concerning employee conduct during official investigations.

37.    The Chief of BOP's Office of Internal Affairs (OIA), forwarded the OIG's investigative report concerning the sexual assault of T.D. and a second unnamed inmate by Defendant Highsmith to Warden Jones. The cover letter to the OIG's report indicated that, "[b]ased on the OIG's findings," misconduct in the nature of an "Appearance of an Inappropriate Relationship" was "sustained" – requiring the Warden to "proceed with disciplinary or adverse action, and notify this [the Office of Internal Affairs] office of the action taken."

38.    The OIA's letter, and the OIG's investigative report on Highsmith were also forwarded to H.J. Marberry, who was at that time the Regional Director of BOP's Southeast Regional Office.

39.     Warden Jones was aware that the allegation of sexual assault against Defendant Highsmith was substantiated by the joint investigation of the OIG and the FBI, but she did not seek to prevent Defendant Highsmith from having unsupervised access to female inmates in future.

40.     Instead, Warden Jones informed Defendant Highsmith that his punishment would take the form of a 10 calendar-day suspension.

41.     Wardens Coil and Jones, as well as SIS Proffitt and Officer Pulido, were aware that Defendant Highsmith had raped an inmate, T.D., in 2014.

42.     Warden Jones was aware that the OIG and the FBI had uncovered substantial evidence that Defendant Highsmith had sexually assaulted T.D. in 2014 and that he lied to investigators about the sexual assaults when he was later questioned.

43.     Despite the clear evidence uncovered from these extensive investigations, Warden Coil failed to take steps to prevent Defendant Highsmith from having unsupervised access to Plaintiff S.P. and other female inmates to whom he posed a clear risk of sexual abuse and sexual assault.

44.     Officer Pulido was aware that the allegation of sexual assault against Defendant Highsmith was substantiated by the joint investigation of the OIG and the FBI and he and participated in the employee grievance process, acting on behalf of Defendant Highsmith.

45.     Officer Pulido was aware that Defendant Highsmith had a history of sexually abusing female inmates and was aware that Highsmith had raped inmate T.D. in 2014 and then lied to OIG investigators concerning the sexual assault.

46.     Officer Pulido failed to take appropriate steps to protect female inmates including S.P., despite his awareness of the risk that Defendant Highsmith posed to her and to all female inmates.

47.     On January 30, 2017, T.D. filed a complaint in federal court (Case No. 17- CV-00059) against defendants U.S.A. and Defendant Highsmith, alleging, *inter alia* that she had been sexually assaulted by Defendant Highsmith.

48.      On January 11, 2018, Warden Jones' deposition was taken in Case No. 17-CV-00059. 70. On February 22, 2018, Case No. 17-CV-00059 was settled for a considerable monetary amount and subsequently dismissed on the same day.

49.     Despite the BOP's "zero-tolerance policy" with regard to sexually abusive conduct by its employees, Defendant Highsmith continued to be employed by the BOP for over two years.

50.     The extent to which the BOP and administrators and rank-and-file officers at FCI Tallahassee would go to shield and exonerate an officer of sexual misconduct and the harm that comes to a woman who reports this conduct is well-known both to the inmate population and to the guards employed at FCI Tallahassee.

51.     Administrators and guards at FCI Tallahassee follow a routine set of practices in which even the most blatant sexual misconduct is tolerated and fostered and in which female inmates are disparaged and retaliated against for resisting or seeking protection from the misconduct.

## Defendant Highsmith's Sexual Harassment, Sexual Abuse, and Battery of S.P. in 2018

52.     At all times relevant to this complaint, Defendant Highsmith had primary supervisory responsibility for the D-Unit – where S.P. was housed with dozens of other inmates - during his regular shifts.

53.     In June of 2018, Defendant Highsmith began a campaign of sexualized harassment against S.P. This pattern of conduct involved, variously, Highsmith's paying an inordinate number of visits to S.P.'s living area, paying extra attention to her, making sexual commentary in her presence and getting physically close to her in the absence of any necessity for doing so.

54.     This pattern of sexual harassment escalated to incidents of sexual harassment and sexual abuse against S.P.

55.      In June of 2018, while conducting his rounds inspecting D-Unit, Defendant Highsmith demanded that S.P. lift the gown that she wore from the shower area to her living area, telling her to expose her breasts and genitalia to him. However, S.P. refused to expose herself to Defendant Highsmith.

56.    This incident caused S.P. to fear that she may eventually be sexually assaulted by Defendant Highsmith, and she attempted to evade him by going to the bathroom when he entered the housing unit or by pretending to sleep when he was conducting rounds in the area where she was housed.

57.    In the weeks following her refusal of his order to lift her gown, S.P. awoke when she felt Defendant Highsmith rubbing her leg and asking her why she was sleeping so much.

58.    The D-Unit at FCI Tallahassee is an inmate living dormitory with an adjoining office that is the permanent office of the guard assigned to oversee the D-Unit. The door to that office opens directly into the D-Unit where inmates sleep in their living quarters.

59.    This adjoining office was apparently occupied on a permanent basis by Officer Brown, as evidenced by the personal effects in the office, which included photographs of his family and commendation plaques and various effects relating to his history of military service and service to the Federal Bureau of Prisons. Officer Brown worked in this office adjoining the D-Unit who worked there every day that he was on shift during all times relevant to this complaint.

60.    Immediately connected to Officer Brown's office is an office referred to as the "guard's office". Each "guard's office" is used by guards on shift who share supervisory responsibility for the housing unit while on shift. While the "guards'

15

office" could be accessed by a corridor rather than through Officer Brown's office, access to that corridor was intermittent and was not always accessible to inmates, depending on the time of day.

61.    Defendant Highsmith routinely walked through Officer Brown's office to access the D-Unit housing area directly.

62.    One evening, S.P. went to the guards' office to request the television remote for inmates in her immediate housing area from Defendant Highsmith.

63.    Defendant Highsmith was on the phone when S.P. arrived at his office. Defendant Highsmith asked S.P. what she wanted, and S.P. pantomimed using a remote control to change channels so as not to interrupt his phone call.

64.    Defendant Highsmith concluded his phone call and told S.P. to come into his office and "grab it [the remote]".

65.    When S.P. entered Defendant Highsmith's office, she could see that he was sitting behind his desk with his penis in his hand and he told her to "grab this [his penis] while you're at it".

66.    S.P. turned around and left Defendant Highsmith's office.

67.    In the following days, S.P. was called to the guards' office on the loudspeaker by Defendant Highsmith.

68.     Deciding that she could later claim to have not heard the loudspeaker command, S.P. did not go to the guards' office because she feared that he would attempt to sexually assault her if she did.

69.     When S.P. did not come to the guards' office when called over the loudspeaker, Defendant Highsmith walked through Officer Brown's office and opened the door into D-Unit and ordered S.P. to come to his office.

70.     Unable to disobey this direct order, which was delivered in person, S.P. walked to through Officer Brown's office to the office where Defendant Highsmith was sitting.

71.     This sequence of events occurred in plain view of Officer Brown, who failed to intervene or prevent S.P. from going into the guards' office alone with Defendant Highsmith.

72.     As S.P. stood at Defendant Highsmith's office door, he told her that she "must love the SHU," because she had refused to come to his office when called on the loudspeaker. Highsmith then ordered her to come inside his office, and S.P. complied.

73.     Defendant Highsmith physically pulled S.P. closer to him and said, "let me see how tight that pussy is," whereupon he immediately put his hand down her pants and forcefully and repeatedly committed the sexual act of shoving his fingers into her vagina.

17

74.     S.P. managed to escape Defendant Highsmith's office and returned to her housing area.

75.     In the weeks following this incident, S.P. lived in fear that Defendant Highsmith would escalate his sexual abusive conduct toward her and she attempted to avoid him by continuing to pretend to sleep during times that he was on shift and by going to the restroom when she thought he might be coming near her housing unit.

76.     On August 28, 2018, on a morning when she was scheduled to be working in the kitchen, Defendant Highsmith approached S.P. as she was sleeping in her bunk.

77.     Defendant Highsmith informed her that she was "out-of-bounds," which is a technical disciplinary infraction used to describe the presence of an inmate in an area where they are not scheduled to be or where their presence is prohibited.

78.     Defendant Highsmith ordered S.P. to "come and see" him in his office.

79.     S.P. did not go to Defendant Highsmith's office for fear that he would sexually assault her. Instead, S.P. went to the restroom to hide from Defendant Highsmith.

80.     BOP policy directs all Bureau of Prisons staff members to abide by core principles when undertaking any disciplinary action against an inmate. Staff are

required to "control inmate behavior in an impartial and consistent manner" and no disciplinary action can be "capricious or retaliatory".[2]

81.    The BOP Program statement outlining inmate discipline procedures organizes disciplinary infractions – "prohibited acts" on a four-level severity scale ranging from Low Severity ("400" series infractions) through to Moderate ("300" series infractions), High ("200" series infractions), and Greatest ("100" series infractions) Severity Level Offenses. These levels are assigned a numerical value so that they can be classified and so that they can be easily rendered into calculations that, in the long term, may determine whether an inmate is eligible for early release, what housing security level they will be assigned to within a facility, whether they will lose credit earned for statutory good conduct time in being considered for release, and whether they will be transferred to a higher-security facility within the Bureau of Prisons system.

82.    In the immediate term, these severity levels are used to calculate what punishment an inmate may receive and whether the disciplinary issue is serious enough to warrant a hearing on 10 days' notice in front of a Disciplinary Hearing Officer (DHO). BOP policy mandates that disciplinary hearings are overseen by correctional officers who work at another correctional facility within the BOP and they ostensibly serve as neutral arbiters who weigh the evidence of an inmate as

---

[2] Bureau of Prison Program Statement 5270.09. *Inmate Discipline Program*. Page.9.

against that of the staff member who filed the Report of a Disciplinary Infraction against them in order to determine guilt and to impose an appropriate sanction if the inmate is determined to be guilty of the allegation. The decisions of DHOs are subject to appeal by the sanctioned inmate and appeals are directed to the Office of General Counsel at the appropriate Regional Office.

83.     On August 24, 2018, Defendant Highsmith issued a disciplinary write-up for the "out-of-bounds" infraction citing a violation of inmate disciplinary code (Code 316 – "Being in an Unauthorized Area") which he noted as having occurred at 8:30 a.m. This document was purportedly created at 1100 a.m. on the same day.

84.     The incident report for this infraction was registered as having been delivered by a Lieutenant to S.P. at 6:26 p.m. -the evening of August 24, 2018. The Lieutenant, whose name cannot be deciphered other than by "Lt." signed the form, attesting to its delivery and the time of delivery of 6:26 p.m.

85.     While S.P. was avoiding Defendant Highsmith in the restroom, an inmate observed and later related to S.P. that Defendant Highsmith had entered her sleeping area and confiscated a change of clothing that she had hung up there earlier.

86.     S.P. then approached Defendant Highsmith and asked whether she could have her clothes returned to which Highsmith replied "it depends".

87. S.P. interpreted Defendant Highsmith's answer to convey that whether she was disciplined would "depend" on whether she obeyed his earlier order to "come see" him in his office.

88. S.P. did not want to go see Defendant Highsmith in his office because she did not want to be further victimized by Defendant Highsmith's sexual acts.

89. Consequently, S.P refused to go see Defendant Highsmith in his office.

90. S.P. used words to the effect that he had a lot of nerve threatening her with a disciplinary infraction if she did not go to his office, since it was apparent to her that he had a habit of sexually abusing inmates, including herself.

91. Distraught, S.P. also expressed words to the effect of "you [are] around here fucking inmates, but I can't have my clothes back?"

92. Defendant Highsmith told Officer Love to "take [S.P.] to SHU" and Officer Love walked S.P. to the hallway area outside of the Lieutenants' offices.

93. Defendant Highsmith drafted and signed a second disciplinary write-up for this incident, citing S.P. for two offenses: the offense of "Insolence" (Code 312) and for "Being unsanitary or untidy; failing to keep one's person or quarters in accordance with posted standards" (Code 330) which he noted as having occurred at 12:35 p.m. This disciplinary report was purportedly created by Defendant Highsmith at 1:48 p.m. on the same day.

94.     In his narrative description in the incident report, Defendant Highsmith wrote that S.P. had "become very upset" and that she had stated, among other things, that he was "around here fucking inmates".

95.     This incident report was registered as having been delivered to S.P. by a Lieutenant Lynch to S.P. at 3:30 p.m. – on the afternoon of August 24, 2018. Lieutenant Lynch signed the form, attesting to its delivery and the time of delivery of 3:30 p.m.

96.     Defendant Highsmith's report of the disciplinary infraction for being "out-of-bounds" hours earlier was delivered to S.P. – and signed off on by a Lieutenant indicating delivery and acknowledgment of the report of a disciplinary infraction –after the disciplinary report alleging the two other disciplinary infractions, one citing her for being untidy, and the other for accusing him of serial sexual assault of inmates ("insolence") had been signed off and delivered by a Lieutenant.

97.     Defendant Highsmith created the disciplinary report citing a violation for being "out-of-bounds" (Code 316) and withheld it, later using it against her when he learned that she would not comply with his order to "come see" him in his office and instead made her vocal allegation against him.

98.     None of these disciplinary infractions would be sufficient, in isolation, to have an inmate sent to SHU for longer than a day. Two disciplinary infractions at

22

the "300" level on a single day would not be sufficient to have an inmate placed in SHU. However, three "300" level disciplinary infractions in a single day would be enough to have an inmate immediately detained in SHU until a disciplinary hearing could be coordinated with a neutral disciplinary hearing officer (DHO).

99.     Defendant Highsmith set this coercive and retaliatory use of the inmate discipline system in motion and other BOP staff, including Officer Love, Lieutenant Lynch, and Lieutenant Rivera were aware that the reason that S.P. was being disciplined was that she was not going to remain silent on the subject of Defendant Highsmith's widely-known practice of sexually assaulting inmates, nor was she going to take orders from him that put her at risk of being sexually assaulted by him again.

100.   S.P. was immediately placed in SHU and her alleged disciplinary infractions were not referred to an outside DHO.

101.   On information and belief, Lieutenant Lynch did not treat the information in Defendant Highsmith's own disciplinary report, specifically the fact that S.P. had shouted that Highsmith was sexually assaulting inmates, as a report of a PREA violation. Nor did he treat this information as sufficiently serious to make his own report, consistent with either the BOP's Employee Code of Conduct, or the BOP's "zero-tolerance" policy with respect of sexually abusive behavior, as mandated by PREA.

23

102.   BOP policy provides that inmates are encouraged to report allegations of sexually abusive behavior to staff at all levels, including local, regional and Central Offices.

103.   BOP policy mandates that staff must report incidents of sexual abuse to the Operations Lieutenant, who is required to immediately safeguard the inmate.

104.   In the Program Statement governing Sexually Abusive Behavior Prevention and Intervention, Bureau staff are clearly informed that that may contact any supervisory staff at the local institution, regional staff, or Central Office staff, including the Regional PREA Coordinators and the National PREA Coordinator. Allegations involving fellow staff members may also be reported to the Office of Internal Affairs or the Office of Inspector General, as appropriate.

105.   BOP policy also mandates that the Operations Lieutenant also ensure that the SIS, Chief of Correctional Services, Institution PREA Compliance Manager, and Warden are notified of any incident of sexual abuse.

106.   On her arrival at the area outside of the Lieutenants' offices before being placed in SHU, S.P. was told by Lieutenant Lynch not to accuse officers of being sexually abusive in the presence of Lieutenants, and Lieutenant Rivera also warned S.P. not to talk about sexually abusive conduct at FCI Tallahassee.

107.   S.P. spent the following 7 days in SHU, essentially in a condition of solitary confinement. S.P. was later informed, at a review of her disciplinary

infractions performed by Officer Pulido, that she had lost her "privileges" for 60 days. She was not allowed to access to email to contact her family, she was not allowed to have visitation with family members, she was denied access to items sold in commissary, and she had all of her personal property impounded.

108.   At that review Officer Pulido informed S.P. that he could only recall guarding 10 inmates in the course of his career that he did not regard to be "human beings". He further informed her that he regarded her to be the "11th inmate" to achieve this distinction of not being regarded by him as a "human being".

109.   BOP policy mandates that inmates can be placed temporarily in SHU involuntarily, for the purpose of protecting the inmate from further sexual abuse.

110.   BOP policy expressly prohibits the use of SHU as a means of punishing and/or silencing inmates at risk of or with knowledge of sexually abusive conduct against inmates by guards. BOP policy certainly does not contemplate the use of SHU as a means of covering up the sexual assault of inmates placed there, nor does it contemplate the use of SHU as a means of covering up the risk posed to inmates by guards who are known to be serial sexual abusers and/or rapists, such as Defendant Highsmith.

111.   The placement of S.P. in SHU and the duration of that placement violated all aspects of the foregoing policy.

112.   Retaliation against victims of sexual assault and/or sexual abuse in BOP facilities is a well-known problem and it is strictly prohibited by BOP Sexually Abusive Behavior Prevention and Intervention Program Statement 5324.12.

113.   On February 4, 2021, the United States Attorney for the Northern District of Florida announced the indictment of Defendant Highsmith, which was issued on February 2, 2021.

114.   Count III of the indictment alleges that Defendant Highsmith sexually assaulted another inmate on or about September 13, 2018, months after S.P. had been placed in SHU for openly accusing Defendant Highsmith of sexual assault of inmates at the facility.

## COUNT I – CLAIMS AGAINST DEFENDANT JIMMY HIGHSMITH PURSUANT TO THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

115.   S.P. re-alleges and incorporates by reference all of the preceding allegations of this Complaint.

116.   As an inmate in the custody of the United States BOP, S.P. had a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

117.   Defendant Highsmith's actions constitute cruel and unusual punishment in the forms of sexual acts, abuse and battery.

26

118.   S.P. was not sentenced to be subjected to sexual victimization. Sexual assault is not a legitimate form of punishment. Sexual abuse, sexual assault and battery are not forms of punishment ancillary to any term of imprisonment.

119.   Sexual abuse and sexual battery serve no legitimate penological purpose.

120.   All of Defendant Highsmith's acts and omissions were taken while acting under color of law and in the scope and course of his position as a Corrections Officer at FCI Tallahassee.

121.   Defendant Highsmith, individually, failed in his duty to provide S.P. with constitutionally safe and secure conditions or confinement.

122.   Defendant Highsmith acted intentionally, maliciously, oppressively and/or with gross negligence against Plaintiff's constitutional rights.

123.   As a direct and proximate result of Defendant Highsmith's misconduct, S.P. was subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

124.   Defendant Highsmith's conduct was of such a quality and nature as to warrant his liability for punitive damages, in accordance with applicable law.

125.   S.P. is also entitled to recover from Defendant Highsmith all compensatory damages recognized by applicable law upon this cause of action.

## COUNT II – CLAIMS AGAINST THE UNITED STATES OF AMERICA: NEGLIGENCE

126.   S.P. re-alleges and incorporates by reference all of the preceding allegations of this Complaint.

127.   Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including FCI Tallahassee.

128.   Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of West Virginia.

129.   Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection . . . of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

130.   Defendant United States and the supervisors and employees of FCI Tallahassee have a duty to provide inmates, being in their custody, with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

28

131.   As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe from known or suspected sexual abusers and/or individuals who pose a foreseeable risk of sexual abuse, sexual assault, and battery.

132.   Correctional officers and other prison officials at FCI Tallahassee have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

133.   Correctional officers and other prison officials at FCI Tallahassee have a non-discretionary duty, pursuant to PREA, to ensure that inmates who have experienced or who have reported sexually abusive conduct by staff are not placed in SHU as punishment for their experience or reporting of sexually abusive conduct at the hands of another employee of the BOP.

134.   Correctional officers and other prison officials at FCI Tallahassee have a non-discretionary duty, pursuant to PREA, to ensure that inmates who have experienced or who have reported sexually abusive conduct by staff are not placed in SHU as a means of concealing facts which give rise to a duty on their part to address the problem of a serial sexual abuser of inmates who is also employed by the BOP.

135.   Correctional officers and other prison officials at FCI Tallahassee have a non-discretionary duty, pursuant to PREA, to ensure that inmates who have

experienced or who have reported sexually abusive conduct by staff are not placed in SHU as a means of forcing them to be silent on the subject of sexually abusive conduct against themselves and other inmates by another staff member.

136.   Correctional officers and other prison officials at FCI Tallahassee have a duty to protect inmates from harm caused by correctional officers and other prison officials.

137.   Correctional officers and other prison officials at FCI Tallahassee have a duty to disallow or sufficiently monitor and supervise one-on-one inmate/officer interactions.

138.   Correctional officers and other prison officials at FCI Tallahassee have a duty to house inmates in a safe and secure manner.

139.   Pursuant to 28 C.F.R. § 115.31, the BOP and FCI Tallahassee had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse and to ensure that such training was properly followed. BOP and FCI Tallahassee breached this duty, and such breach was a proximate cause of the injuries and damages alleged herein.

140.   BOP and FCI Tallahassee had a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers and to ensure that such training was properly followed. Plaintiff was retaliated against, and therefore BOP and FCI Tallahassee breached this duty, and such breach was a proximate cause of the injuries and damages alleged herein.

141.   Pursuant to 28 C.F.R. § 115.17, BOP and FCI Tallahassee officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider any incidents of sexual harassment, whether the employee has engaged in sexual abuse, and whether the employee has been convicted or civilly adjudicated of sexual abuse.

142.   Upon information and belief, BOP and FCI Tallahassee failed to perform their non-discretionary duties with respect to Defendant Highsmith or failed to appropriately responsively act if they did perform such duties.

143.   BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FCI Tallahassee to ensure that correctional staff properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

31

144.   Prison officials at FCI Tallahassee knew or should have known that Defendant Highsmith should not have been permitted to have unsupervised access to inmates, including S.P., to whom he posed an excessive and unreasonable risk.

145.   Through the conduct of Defendant Highsmith and other BOP employees, all of the duties encompassed by this count were breached, and as a proximate result Plaintiff sustained injuries and damages.

146.   As a direct and proximate result of these breaches of duties, S.P. suffered personal injuries associated with and arising from sexual acts, sexual abuse and sexual battery including, but not limited to, physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

147.   S.P. is also entitled to recover from Defendant United States of America all compensatory damages recognized by applicable law upon this cause of action.

## COUNT III – CLAIMS AGAINST THE UNITED STATES OF AMERICA UNDER THE FTCA: ASSAULT AND BATTERY

148.   S.P. re-alleges and incorporates by reference all of the preceding allegations of this Complaint.

149.   The actions of Defendant Highsmith constitute assault and battery in violation of state law.

150.   Defendant Highsmith assaulted and battered S.P. through, but not limited to, unwanted, non-consensual sexual abuse, sexual battery, and harassment.

151.   All of Defendant Highsmith's acts and omissions were taken while acting under color of law and in the scope and course of his position as a Corrections Officer at FCI Tallahassee.

152.   As a result of Defendant Highsmith's sexual assault and battery, S.P. suffered physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently.

153.   Under the Federal tort Claims Act, the Defendant, United States of America, is liable to S.P. for the unlawful actions of Defendant Highsmith as he was acting within the scope of his employment as a law enforcement officer of the United States BOP.

154.   S.P. is also entitled to recover from Defendant United States of America all compensatory damages recognized by applicable law upon this cause of action.

## COUNT IV: CLAIMS AGAINST NAKAMOTO, INC.: NEGLIGENCE

155.   S.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

33

156.   As mandated by PREA, the BOP conducts PREA audits at each federal prison facility once every three years. At all times relevant to this complaint, PREA audits for all BOP facilities were conducted by Nakamoto.

157.   Upon information and belief, Nakamoto's contract with the BOP specified that Nakamoto would not be subject to Government supervision, except for security related matters.

158.   The contract under which Nakamoto conducted its PREA audit at FCI Tallahassee was transactional and it was bargained for.

159.   The primary purpose of the onsite phase of the PREA audit inspection is to assess the day-to-day practices used by facility staff to promote sexual safety and to prevent rape in prison. During the onsite phase of a PREA audit, auditors are supposed to conduct a thorough examination of the entire facility, observe routine activities, interview staff and inmates, and review and retain key documents maintained by the facility.

160.   During the "onsite review" component of an audit, PREA compliance auditors are required to spend a number of days (usually three) at the facility conducting a site inspection and conducting interviews with both executive and rank-and-file staff and inmates randomly selected by the auditor during the site visit, or inmates previously identified by the facility as being fairly representative of a number of inmate social categories, such as: youthful inmates, inmates with limited

English language proficiency and transgender inmates. Finally, PREA audits are supposed to involve a careful process of documentation selection and review. These core components form the foundation of a practice-based audit methodology.

161.   Nakamoto contractors conducted audits of FCI Tallahassee in June of 2015 and in March of 2018.

162.   The PREA audits conducted by Nakamoto were materially incomplete, as auditors failed to properly conduct required systematic reviews of documents held by FCI Tallahassee related to sexual abuse and sexual harassment allegations over the prior 12 months at the facility; failed to properly interview inmates and/or staff that were involved in or witness to PREA violations by Highsmith or any other guard.

163.   Nakamoto auditors were required, at minimum, to collect and review all reports of sexual abuse and harassment and documentation of investigations, including full investigative reports with findings. They were also required to collect and review all documentation relating to referrals of allegations of sexual abuse and sexual harassment. Further, Nakamoto auditors were required to collect and review any grievance that alleged sexual abuse and the final decision made in respect of such grievances.

164.   In its report related to the audit conducted at FCI Tallahassee from June 2 to June 4, 2015, Nakamoto Group's report simply notes that "there were no

criminal investigations in the last year" relating to sexually abusive conduct at the facility.

165.   Defendant Highsmith's sexual assault of T.D. occurred on April 30, 2014 and was the subject of both an internal and a criminal investigation.

166.   Defendant Highsmith was interviewed by investigators Claire Foley of the Office of Inspector General and by Federal Bureau of Prisons Special Investigative Agent Dan Clark on May 6, 2014. The investigation of Defendant Highsmith carried on from May 2014 and a final report was not tendered until October 2015.

167.   Despite the active and on-going investigation into the sexual assault of T.D. by Defendant Highsmith, which had gone on from early May, 2014 to October, 2015, Nakamoto auditors failed to collect and review the voluminous documentation of the investigation into the sexual assault of T.D. by Defendant Highsmith and simply concluded there were "no criminal investigations in the last year".

168.   Nakamoto was required to review internal records at FCI Tallahassee as part of the auditing process, including but not limited to background check records; supervisory rounds logs; risk screening and intake processing records; medical files; and investigative files—including a review of a representative sample of each type of record. These records would have played a crucial role in providing

an accurate impression of what FCI Tallahassee was doing to protect inmates such as the plaintiff from sexual assault and sexual harassment.

169.   Nakamoto failed to review appropriate records and/or failed to note discrepancies, irregularities or problems that should have been readily apparent from the well-known activities of Highsmith and/or other staff at FCI Tallahassee.

170.   PREA audits are organized into five stages that unfold chronologically: the pre-onsite audit, onsite audit, evidence review and interim report stage, and, finally, the corrective action and final report stages.

171.   The pre-onsite audit stage essentially consists in the gathering of information for which the actual presence of the auditor at the facility is not required. For example, auditors are required to attempt to communicate with community based or victim advocates who may have insight into relevant conditions in the facility prior to the "onsite" portion of the audit.

172.   The "onsite" portion of the PREA audit process consists of "site review, interviews, and documentation selection and review". This means, respectively, that auditors are expected to visit the facility to conduct in-person inspections to determine compliance with mandated standards, they must conduct several confidential interviews with staff and a representative sample of a minimum number of inmates, and they must collect and review various forms of documentation that the facility has in its custody. All of these steps within the "onsite" review

component are ostensibly aimed at the collection and analysis of data that allow the auditor to determine compliance with standards that are designed to detect, address, and mitigate the risk of sexually abusive conduct faced by inmates in the custody of the facility.

173. Prior to the "onsite" component of its audit of FCI Tallahassee, Nakamoto failed to conduct a broad internet search on the facility in advance of the audit to determine if there was any relevant information that might have shed light on the culture and history of the facility such as recent budgetary or staffing changes, legal action against the facility, press clippings, and other information that might inform the audit. If Nakamoto did conduct such a search, it ignored the readily available information regarding longstanding and ongoing sexual misconduct by guards against inmates at FCI Tallahassee.

174. As part of the "onsite" auditing function, Nakamoto auditors were entitled to unfettered access to a variety of sensitive and confidential documentation and information. The information contained in these documents is crucial to forming an accurate impression of what FCI Tallahassee guards and administrators were actually doing to protect inmates such as S.P. from sexual abuse and retaliation.

175. Nakamoto auditors either performed cursory or insufficient examinations of these sensitive and confidential documents, or it failed to collect

and analyze them in a manner sufficient to the task of shedding light on the risk of sexual violence faced by inmates such as S.P. at FCI Tallahassee.

176.   PREA Standard 115.401(h) states, that all auditors "[shall] have access to, and shall observe, all areas of the audited facilities." To meet the requirements in this Standard, the site review portion of the onsite audit must include a thorough examination of the entire facility.

177.   Nakamoto was required to be critically engaged in the assessment of crucial facility functions including but not limited to: intake and risk screening; activity in the housing units; bathroom and shower procedures; staffing ratios; cameras and surveillance technology deployment and use; access to reporting entities; and supervision practices at FCI Tallahassee.

178.   Nakamoto consistently failed to conduct thorough examinations of critical facility functions FCI Tallahassee.

179.   Nakamoto failed to use reasonable care and diligence to hire, train, and supervise its audit-performing staff to obtain sufficient facts to support all statements, conclusions, and findings of the audits performed at FCI Tallahassee.

180.   The negligent and/or improper performance of inspections by Nakamoto at FCI Tallahassee failed to identify and address obvious signs of endemic sexual abuse at the facility and was a proximate cause of the injuries and damages suffered by S.P. and other female inmates at FCI Tallahassee.

181.   As a direct and proximate result of Nakamoto's negligence and misconduct, S.P. was intentionally subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

182.   S.P. is also entitled to recover from Defendant Nakamoto all compensatory damages recognized by applicable law upon this cause of action.

## COUNT V – NAKAMOTO GROUP, INC.: BREACH OF CONTRACT

183.   S.P. re-alleges and incorporates by reference all for the preceding allegations set forth herein.

184.   Nakamoto Group, Inc. (Nakamoto) operates as an SBA 8(a) Program minority business which, because of such status, receives certain preferential benefits in applying for and receiving bids on Federal government contacts.

185.   After having received federal contracts in unrelated areas of government work, Nakamoto entered into various contracts with the United States to perform audits of detention facilities (e.g., ICE facilities on the U.S. border) and to perform Prison Rape Elimination Act (PREA) audits of Bureau of Prisons correctional facilities.

186.   Upon information and belief, the contract regarding PREA audits for BOP correctional facilities, including FCI Tallahassee, have paid Nakamoto by way of consideration large sums of money measured in the millions of dollars.

187.   The purpose of the Prison Rape Elimination Act (PREA) auditing function, which Nakamoto contracted to provide for the BOP, was to ensure compliance with the mandates of the Prison Rape Elimination Act (PREA) 34 U.S. Code § 30301.

188.   The stated purpose of PREA, among other things, is to "increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape" and to "protect the Eighth Amendment rights of Federal, State, and local prisoners."[3]

189.   Pursuant to its contract with the BOP, Nakamoto was required to conduct audits relevant to each facility's PREA-mandated obligation to address and mitigate the risk faced by S.P., and all inmates similarly confined in the care and custody of the BOP, with respect to sexual abuse and sexual harassment.

190.   Nakamoto was contractually required to perform its compliance investigations diligently, and in such a way as to uncover information relevant to each facility's obligation to keep all inmates, including S.P., safe from sexual abuse and sexual harassment.

191.   Plaintiff S.P., at all times relevant to the allegations herein, was a federal inmate in the care and custody of the BOP at FCI Tallahassee and thus an individual to be protected from sexual assault, sexually abusive conduct, and

---

[3] (*Prison Rape Elimination* Act, P.L. 108-79 § 3).

retaliation for reporting the sexual assaults and/or the sexually abusive conduct of BOP employees.

192. The manifest intent and/or purpose of the contract between Nakamoto and the BOP was to ensure compliance with the mandates of PREA for the benefit of inmates such as S.P.

193. Nakamoto breached the contract by failing to conduct appropriate and meaningful PREA audits and to make appropriate and meaningful reports which would have provided the BOP with the necessary information to take corrective action to fulfill the purpose of PREA.

194. Nakamoto was contractually obliged to conduct inspections and to be diligent in its efforts to uncover information relevant to the risk of sexual assault, sexual abuse, and retaliation and to the facility's obligation to keep plaintiff, and all inmates similarly situated to her, safe from sexual assault, sexual abuse and retaliation.

195. Instead, Nakamoto's inspection practices were inconsistent, were not sufficiently thorough, and failed to fully examine actual conditions at FCI Tallahassee with a view to identifying deficiencies.

196. For example, from March 20-22nd, 2018 a single Nakamoto employee was tasked with conducting the entire "onsite" portion of the PREA audit at FCI Tallahassee.

197.   PREA Standard 115.401(h) provides that the auditor "shall have access to, and shall observe, all areas of the audited facilities." This "onsite" component consists of a facility inspection which required the auditor engage in an active process of inquiry to determine whether, and to what extent, the day-to-day practices at FCI Tallahassee demonstrated genuine compliance with PREA-mandated standards.

198.   At a minimum, the "site review" component of the "onsite" portion of the audit would have required the Nakamoto auditor to inspect 8 Multiple Occupancy Cell housing units, 4 Open Bay Dorm housing units, 41 Special Housing Unit (SHU) cells, and intake processing areas in both the FCI building and in the Federal Detention Center (FDC) building. The Nakamoto auditor was also required to inspect the Health Services Departments at both the FDC and the FCI, as well as the Education, Visiting, Recreation, Food Service, and facility support and programming areas at both the FCI and FDC.

199.   More than simply a take a passive tour, the Nakamoto auditor was required, in each of these buildings, to engage critically with facility functions such as intake and risk screening; cross-gender announcement; grievance processes; use of signage throughout the facility; activity in the housing units; bathroom and shower procedures; staffing rations; cameras and surveillance technology deployment and

use; working condition of telephones, kiosks, ad other devices; access to reporting entities; and supervision practices.

200.   The single Nakamoto auditor tasked with conducting the PREA audit of FCI Tallahassee reported that he had conducted an inspection of the facility's 32 buildings in the form of a "comprehensive tour" on a single day - his first day at the facility – and not before he had conducted a briefing meeting with facility administrators earlier that same day.

201.   The "interview" component of the "onsite" review required as part of each PREA audit was conducted by Nakamoto's auditor on the second day of his compliance inspection. According to the final report, this lone auditor conducted interviews with no fewer than 28 members of staff sampled from those available at both the FCI and FDC components of the facility on a single day. In addition to the members of staff, the same auditor also purported to have conducted interviews with no fewer than 31 inmates selected for interviews from both the FCI and FDC components of the facility.

202.   This auditor was not only required to conduct interviews with a representative sample drawn from the available pool of staff and inmates at FCI Tallahassee, but he was also expected to conduct these interviews with sufficient depth to elicit information concerning the practices at the facility as they related to specific PREA standards and more general attitudes amongst inmates and staff with

44

respect to sexual abuse and sexual harassment at FCI Tallahassee. He was further required to take and maintain interview notes to guide his evaluation of interview content and its relationship to other evidence when making compliance determinations for each provision of every PREA standard audited.

203.   Nakamoto failed to devote sufficient resources to the task of thoroughly conducting each of the requisite components of each facility audit and did not deploy the number of staff that would have been required to conduct a thorough audit of FCI Tallahassee.

204.   On information and belief, Nakamoto's auditors took "tours" in lieu of conducting bona fide facility inspections, they relied on answers from facility staff and merely reviewed the written policies and procedures to substantiate those answers, they did not meet their contractual obligation to observe and evaluate facility conditions, nor did they critically analyze the internal documents that they had unfettered access to. These breaches had real consequences for the safety and wellbeing of inmates housed at FCI Tallahassee, including S.P.

205.   As a direct and proximate result of Nakamoto's the breach of the contract between Nakamoto and the BOP, S.P. was injured and damaged as alleged above.

206.   S.P. is also entitled to recover from Defendant Nakamoto all compensatory damages recognized by applicable law upon this cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Honorable Court grant her the following relief:

1. Compensatory damages as to all Counts;

2. Punitive damages as to Count I against Defendant Highsmith, and not as to any Count against the United States of America or Nakamoto;

3. Reasonable attorneys' fees and costs in accordance with applicable law; and,

4. Such other further relief as this Court in its discretion deems just.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on any and all Counts so triable under applicable law.

> S.P.,
> Plaintiff
>
> */s/Ryan J. Andrews*
> Steven R. Andrews (FBN 0263680)
> Ryan J. Andrews, Esq. (FBN 104703)
> Andrews Law Firm
> 822 N Monroe Street
> Tallahassee, FL 32303
> P: (850) 681-6416
> *ryan@andrewslaw.com*
> *service@andrewslaw.com*

*/s/Jay T. McCamic*

Jay T.       McCamic, Esq. (WVSB#2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/L. Dante diTrapano*

L. Danté diTrapano, Esq. (WVSB#6778)
Calwell Luce diTrapano, PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
Benjamin Adams, Esq. (WVSB#11454)
badams@cldlaw.com
Alex McLaughlin, Esq. (WVSB#9696)
amclaughlin@cldlaw.com

*s/Anthony I. Werner*

Anthony I. Werner, Esq. (WVSB#5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com